# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| **JANE DOE,** | |
| Plaintiff | Case No. |
| v. | Hon. |
| **SHERIFF GARRY MCFADDEN,** Mecklenburg County Sheriff's Office, in his official capacity, only; | **VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND FOR DAMAGES** |
| **OFFICER A,** Mecklenburg County Detention Center Central, in her individual capacity, only; | |
| **OFFICER B,** Mecklenburg County Detention Center Central, in his individual capacity, only; | |
| Defendants. | |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND FOR DAMAGES

Plaintiff **JANE DOE,** by and through her attorneys, CAIR Legal Defense Fund ("CAIR"), brings this complaint for declaratory and injunctive relief and for damages against Defendant **SHERIFF GARRY MCFADDEN,** of the Mecklenburg County Sheriff's Office ("MCSO") for violating religious guarantees under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") and the Due Process Clause of the Fourteenth Amendment to the US Constitution, and Defendant **OFFICERS A and B** of the Mecklenburg County Detention Center Central ("MCDCC") for violating the First and Fourth Amendments to the US Constitution, and 42 U.S.C. §2000cc *et seq*., and pursuant to 28 U.S.C. §1331 and 42 U.S.C. §1983, states as follows:

### Nature of this Action

1

1.      On February 28, 2024, officers at MCDCC forced Jane Doe, a 23-year-old Muslim woman, to remove her religiously mandated hijab while in their custody, in plain view of the officers and detainees present. The Defendant officers then forced her to take a booking photograph without her hijab despite her repeated protestations that the hijab was required by her faith.

2.      Doe has practiced Islam her whole life and began wearing the hijab in 2022. She has not willingly been seen in public without it since, as her faith requires her to always cover her hair, ears, and neck in mixed gendered spaces outside her immediate family. Doe's religious beliefs are deeply rooted in Islamic texts and teachings. Her hijab is a pillar of her religious practice and integral to her identity as a Muslim woman.

3.      Defendant Officers then uploaded her photograph to a statewide database that is accessible to all law enforcement agencies in North Carolina as well as members of the public who search Doe's name on the MCSO website or the Internet. Upon information and belief, Defendants also have security footage of Doe without her hijab while in their custody saved to their database.

4.      Appearing in public without her hijab and/or having her hijab less image viewed by men outside her immediate family is a severe breach of Doe's sincerely held religious beliefs. Together, by photographing Doe and publicly posting her photograph, Defendants memorialized this violation of her rights under the Religious Land Use and Institutionalized Persons Act (RLUIPA). The accessibility of this image and potential security footage perpetuates the violation that began on March 27, 2024, and continues to this day.

5.    Furthermore, the posting of Doe's mugshot alongside personal and confidential identifying information prior to any conviction resulted in punitive humiliation and substantial harm to her reputation that persists to this day, despite the dismissal of the charges against her, in violation of her due process rights.

6.    This action seeks declaratory relief against the defendants and injunctions ordering the government to (1) destroy all copies of Doe's uncovered photographs from their database and any other visual media such as security footage, (2) instruct all other agencies or third parties with access to the photograph to do the same, (3) change their policies to accommodate religious head coverings so that no more uncovered photographs of Muslim women like Doe are taken, and (4) cease their practice of posting mug shots and personal identifying information on their official website without due process.

7.    This action also seeks compensatory, constitutional, and nominal damages against the individual capacity defendants For their violations of Doe's rights under the First and Fourteenth Amendment.

## Jurisdiction and Venue

8.    This action arises under 42 U.S.C. § 1983, and the laws and Constitution of the United States.

9.    This Court has original federal question jurisdiction over Doe's claims of violations of the United States Constitution and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc et seq., pursuant to 28 U.S.C. §1331 and 42 U.S.C. § 1983.

10.    This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1343, over Doe's claims related to the deprivation under color of state law of rights secured by the First

and Fourth Amendments to the Constitution of the United States and the laws of the United States.

11.     This Court has jurisdiction over Doe's constitutional claims pursuant to 42 U.S.C. § 1983.

12.     Doe's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, 28 U.S.C. § 1343, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the general, legal, and equitable powers of this Court.

13.     This Court has personal jurisdiction over Defendants because Defendants reside and conduct business in North Carolina.

14.     Doe's claims for attorneys' fees and costs are predicated on 42 U.S.C. §§ 1988 and 2000cc-2(d), which authorize the award of attorneys' fees and costs to prevailing parties, pursuant to 42 U.S.C. § 1983 and RLUIPA.

15.     Venue is proper under 42 U.S.C. § 1391 as to all Defendants because Defendants operate within the geographical boundaries of North Carolina, and the substantial part of the described acts occurred within this District.

## Parties

16.     Plaintiff, Jane Doe, is a Muslim woman and a resident of Charlotte, North Carolina. She was and is at all relevant times an "individual," as defined in 42 U.S.C. § 2000cc, et seq.

17.     Defendant Garry McFadden is the Sheriff of the Mecklenburg County Sheriff's Office, a municipal corporation duly organized under and with all the powers specified and implied by the laws of the State of North Carolina, which carries on governmental functions in Mecklenburg County.

4

18.     Defendant McFadden runs the Mecklenburg County Sheriff's Office and oversees its two jail locations, including Mecklenburg County Detention Center Central ("MCDCC"). At all relevant times, McFadden was a decision-maker and possessed the authority to adopt policies and prescribe rules, regulations, and practices affecting all facets of the training, supervision, control, employment, assignment, and removal of individual officers of MCDCC. This authority includes the supervision over those individual officers of the MCDCC charged with operating and overseeing the search, seizure, detention, and arrests at MCDCC.

19.     At all relevant times, Defendant Sheriff McFadden was the employer and supervisor of Defendants Officer A, Officer B, and Officer C. Defendant McFadden's principal office is located at 700 East Fourth Street, Charlotte, North Carolina 28202. Defendant McFadden is sued only in his official capacity.

20.     Defendant Officer A is an officer employed by MCDCC. At all relevant times, she was charged with protecting the constitutional rights of incarcerees in her custody and control and assuring that her actions comply with applicable policies, rules, regulations, customs, practices, and procedures of MCDCC in addition to local, state, and federal laws. Defendant Officer A personally engaged in discriminatory behavior against Doe and deprived her of her rights while she was in her custody and control. Upon information and belief, she is a resident of this judicial district. She is being sued only in her individual capacity.

21.     Defendant Officer B is an officer employed by MCDCC. At all relevant times, he was charged with protecting the constitutional rights of incarcerees in his custody and control and assuring that his actions comply with applicable policies, rules, regulations, customs, practices, and procedures of MCDCC in addition to local, state, and federal laws.

Defendant Officer B personally engaged in discriminatory behavior against Doe and deprived her of her rights while she was in his custody and control. Upon information and belief, he is a resident of this judicial district. He is being sued only in his individual capacity.

## Factual Background

22.     Jane Doe is a Muslim woman and resident of Charlotte, North Carolina. She has lived in Mecklenburg County since 2007, and supports herself as a neurobehavioral therapist working with children who have autism.

23.     Doe has been a Muslim her entire life. She wears the hijab, a headscarf worn by Muslim women that covers their hair, ears, and neck. Doe has worn the hijab since 2022, when she was 21 years old.

24.     Doe's decision to begin wearing the hijab in compliance with her faith has changed her life in many ways. Relevantly, she is now in the process of updating her North Carolina driver's license to utilize a picture of her with the hijab on. She intends to do the same upon renewal of her U.S. passport.[1]

25.     Doe's faith requires her to always wear a hijab when she is in mixed-gender spaces outside of her immediate family. The practice of wearing a hijab includes not only the headscarf but also clothing that covers her full body. Doe's religious beliefs are deeply rooted in Islamic texts and teachings. Her hijab is a pillar of her religious practice and integral to her identity as a Muslim woman.

---

[1] As of the time of filing this complaint, Doe has been placed on a waiting list for an appointment with her local secretary of state. When her passport is renewed, she intends to take the new photograph with her hijab on. Both the state of North Carolina and the federal government allow for hijabs in these crucial identification photos without issue.

6

26.     Appearing in public without a hijab or being photographed without wearing a hijab and having that photo available to the public is a serious breach of Doe's faith. It is a deeply humiliating and defiling experience in conflict with her sincerely held religious beliefs.

27.     On February 26, 2024, Doe exercised her constitutional rights by protesting outside a City Council meeting. In response, the Charlotte Mecklenburg Police Department issued a warrant for her arrest the next day for violation of a noise ordinance and for impeding traffic.[2]

28.     On February 28, 2024, at approximately 2:00 PM, Jane Doe voluntarily turned herself in at the Mecklenburg County Detention Center Central.

29.     Doe entered the facility wearing her hijab and corresponding modest clothing (a long, full-sleeved shirt and full-length leggings). Her hijab was wrapped around her head, covering her hair, ears, and neck, and fastened together by small magnets to ensure it did not slip off.

30.     Doe was checked into MCDCC by two male officers at the front desk.

31.     A black male officer took her name and her driver's license. He then asked Doe about her faith. She informed the two officers that she was a Muslim. The black male officer then scanned her driver's license and handed it back. The white male officer then stood and began to arrest her. He handcuffed her and removed the magnets fastening her hijab. She was allowed to keep the hijab on at this point, and it remained wrapped around her head.

32.     Doe then asked the officers how long she would be there, and they each responded that they 'didn't know.' One hypothesized that she would be there until the next day.

---

[2] *See* Register of Actions, Mecklenburg District Court, Case no. 24CR244642-590 (June 4, 2024)

33. The white male officer then walked her downstairs to the basement for processing. The basement was an open area with an entryway, various stations for photos and fingerprinting, and holding rooms, all of which could be seen into without obstruction.

34. The officer then walked Doe around the entire area, looking for a spot to place her. At the time, Doe was the only female detainee in the area. There were approximately 30 male officers and detainees, all of whom saw white male officer walk her around with her hijab still on. In that moment, Doe felt like she was being paraded around, like a show. She felt deep uncomfortable as she noticed how many male eyes fell on her during this time.

35. After a short wait, the white male officer handed Doe off to a female officer (hereby referred to as Defendant Officer A). Officer A was a light skinned black woman with blue/green eyes.

36. Officer A escorted Doe to the booking photo station near the entryway. The station was clearly visible to all those in the basement area. There were no walls, screens, or dividers providing any privacy.

37. In plain view of the male officers and other detainees, Officer A began to pat down and search Doe, who was still handcuffed. Officer A lifted Doe's shirt, revealing her abdomen to the room, and patted her breasts. Doe was shocked and froze at the sudden reveal. She became hyperaware of all the male eyes on her as she was exposed. Doe felt extremely uncomfortable and violated.

38. In addition to exposing Doe's body in plain view of strange men in violation of her sincerely held religious beliefs, Officer A then told Doe she had to remove her hijab. Officer A explained that this would be to search Doe's hair and to take Doe's booking photo. She also told Doe she would not be allowed to have her hijab back afterwards.

8

39.     Doe was instantly filled with dread. She begged Officer A to allow her to keep her hijab on. She explained to Officer A that she is required to wear her hijab in accordance with her religious beliefs. Nevertheless, Officer A firmly refused.

40.     Doe asked again, emphasizing that she was a Muslim woman and this was crucial for her. Officer A vehemently refused and told Doe her hijab was considered "contraband."

41.     Doe felt scared to push further. Based on Officer A's aggressive refusal, Doe felt like she would be in danger and/or held in the facility longer if she kept asking.

42.     Instead, Doe then asked if they could at least go into the women's bathroom for the removal and search. Doe and Officer A were standing immediately in front of the bathroom at the time, so Doe reasoned that Officer A could at least conduct the inspection under her hijab in private.[3] Officer A rejected this proposal and insisted that Doe was required to take the hijab off where they were standing.

43.     In total, Doe and Officer A went back and forth for approximately two minutes on this issue. At one point, Doe even tried to bargain – she asked that her hijab to stay on in at least one photo, and that could be the one published. She explicitly told Officer A that she would feel ashamed and be humiliated if her family, friends, and male community members saw a hijab less photo of her posted online. Officer A showed no empathy for the humiliation, and demanded Doe remove her hijab.

44.     Finally, overwhelmed with the pressure, Doe felt she had no choice and reluctantly relented. Recalling what the officers upstairs had told her about not knowing when

---

[3] Doe later witnessed another female detainee (who did not wear the hijab) arrive and be taken into that very bathroom to be privately searched.

she would be released, she hoped complying with the violative request would help her avoid staying overnight in the facility.

45.     As Doe was still handcuffed, Defendant Officer A removed her hijab, exposing her hair, neck, and ears to everyone in the basement area.

46.     Officer A then removed Doe's hair tie and searched through Doe's hair.

47.     Doe felt naked and embarrassed at being seen without her hijab, especially after begging and trying to reason with Officer A. Doe felt the situation was made even worse because she realized everyone in the room had just seen her with her hijab on. They had all seen her beg to keep it and could all now see her without it. Doe felt that the violation hurt even more because the crowded basement of people (majority men) all knew she was Muslim.

48.     Officer A then removed Doe's handcuffs.

49.     A short, bald black male officer (hereby referred to as Officer B) had been on standby in the booking photo station, watching this interaction. Once Doe's hijab was removed and search complete, he stepped in and told Doe that it was time to take her photo.

50.     Desperate, Doe repeatedly asked Officer B to just let her have her scarf on for the photo. Officer B disregarded her requests.

51.     Defendant Officer B took Doe's booking photograph without her hijab on. As he did so, Doe felt like she was going to cry, and tried desperately to maintain her composure.

52.     Together, the Defendants photographed Doe without her hijab and exposed her during her detention and in full view of strange men, in violation of her sincerely held religious beliefs.

53.     This hijab-less photograph was uploaded to Mecklenburg County Sheriff's Office database within hours of being taken. The illegal photograph is now available to any

member of the public who simply Googles Doe's name. It can be found directly on the Mecklenburg County Sheriff's Office website. Exhibit A. It was also available on a third-party website known as 'Mugshot Zone' until Doe's counsel intervened and had it removed on August 28, 2024. Exhibit B.

54.     By photographing Doe without her hijab and uploading that photograph to a public database, Defendants have permanently memorialized the violation of Doe's religious rights in a manner that continuously perpetuates the violations that occurred that day.

55.     After taking the booking photo, Doe, still hijab-less, was escorted by Officer A towards the basement's central area, closer to all the other detainees and officers. Officer A then had Doe complete fingerprints, provide a urine sample, and performed a full body electronic scan.

56.     Once her processing was complete, Doe sat mortified in that waiting area, hijab less, surrounded by male officers and detainees.

57.     Approximately 5 hours later, Doe was called to appear before the magistrate. She was escorted there by another officer and seated in the row farthest away from the magistrate. As a result, she was forced to walk past all the male detainees seated ahead of her, yet again without her hijab, to get to her seat. And then again when she returned to her seat. Doe recalls about 30 male detainees in the room and roughly 4 male officers. Again, she felt exposed and humiliated, like she was being paraded around.

58.     Doe then retained to basement waiting area for another two hours with approximately 40 other male detainees present.

59.     At no point did the Defendants (Officer A, Officer B, or any other officer employed by MCSO / MCDCC) return her hijab. This experience caused Doe to suffer prolonged distress and humiliation.

60.     Once it was time for her release, a new male officer arrived to escort Doe upstairs to check out. As they walked, Doe asked the officer for her hijab back, and he told her that her hijab was upstairs.

61.     When they made it upstairs, Doe was taken to a desk in the lobby where two black female officers sat. There were also two white male officers present in the lobby who saw her without her hijab.

62.     She asked the two female officers if she could have her hijab and put it on. They refused and told Doe that she needed to 'check out' her hijab along with the rest of her items first and was not allowed to open the plastic bag it was in until she was out of the facility. Doe complied and checked out her plastic bag. Once the process was complete and Doe was free to leave, she walked down a hallway to a semi-private corner and immediately put her hijab back on. She then left the facility.

63.     Once outside, Doe was greeted by family and friends who quickly informed her that her hijab less mugshot was online, and they had all seen it.

64.     Doe's hijab-less booking photo has violated her privacy and dignity as a Muslim woman. In addition to being available in the MCSO's database and online, this public photo has been passed around through online group messages and used to harass Doe. Her male peers have now seen Doe without her hijab without her consent. The image continues to haunt her every day.

65. Jane Doe's booking photograph, and any visual media capturing her while she was not fully clothed at any time during her detention, are permanent records that perpetuate the harm and anguish Doe is suffering. The very existence of these records is an ongoing violation of her sincerely held religious beliefs.

66. The booking photo and arrest information were published alongside personal and confidential information including her full name, birthdate, weight, height, and city of residence, aggravating her humiliation and reputational harm. Despite the charges being dismissed, the information and photograph remains on MSCO's website to this day, in violation of her due process rights.

## COUNT I

**Religious Exercise**
**Violation of the Religious Land Use and Institutionalized Persons Act (RLUIPA)**
**42 U.S.C. §2000cc**
**(Against Official Capacity Defendant)**

67. Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

68. Together, Defendants imposed a substantial burden on Plaintiff's free exercise of her religion.

69. The official capacity Defendant's acts or omissions, policies, and customs, while Doe was detained by MCDCC, substantially burdened her religious exercise of wearing hijab in mixed-gendered spaces.

70. RLUIPA provides that: "No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-(1) is in furtherance

13

of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a)(1)-(2).

71.     At all relevant times, Doe was confined to a qualifying institution when the events transpired.

72.     Doe's wearing of hijab and modest clothes in accordance with hijab is an exercise of sincerely held religious beliefs and obligations.

73.     The government's officer's removed Doe's hijab throughout the facility, took and publicly published a photo of Doe without her hijab, and exposed her in an open room full of strangers, impeding her constitutional and statutory rights.

74.     In his official capacity, Sheriff   McFadden maintained or tolerated unconstitutional customs, practices, and policies that facilitated the deprivation of Doe's rights.

75.     Sheriff McFadden's acts or omissions, policies, and customs do not further a compelling government interest in identifying arrestees. A photograph of a person's face is sufficient for identification by other law enforcement and government agencies. In fact, the United States Department of State allows persons to wear religious head coverings in their passport photos so long as their faces remain visible.[4] Covered photographs would make it easier to capture Mohammed's everyday appearance and thereby serve MCSO's purposes more effectively than the uncovered photos that violate her religious rights. After all, if the goal is to have a record of her appearance, that is achieved by documenting her regular everyday likeness while incarnated, rather than one of a traumatized individual who ordinarily always wears a hijab.

---

[4] *See* U.S. Dep't of State, Bureau of Consular Affairs, How to Apply: Passport Photos; *see* also Foreign Affairs Manual  8 FAM 402.1-4(c)(3)

14

76. A photograph of a person's face is sufficient for identification for other law enforcement and government agencies. The United States Department of State allows persons to wear religious head coverings in their passport photos so long as their faces remain visible. U.S. Foreign Affairs Manual 8 FAM 402.1- 4(c)(3) ("[H]ead coverings may be acceptable if the applicant can establish that the hat or head covering is part of recognized, traditional religious attire which is customarily or required to be worn continuously when in public.") The US Bureau of Consular Affair's website features photographic examples of this exception in practice. Presently, the page shows a contrasted 'acceptable' image of a woman with a hijab that fully shows her face against an 'unacceptable image' where the same woman's hijab blocks part of her face.[5]

77. Furthermore, other state and local carceral facilities across the country—including the State of New York Department of Correctional Services and NYPD—allow Muslim women to wear their hijab while being photographed during booking.[6] A picture with the hijab is also used on the identification cards of their incarcerees.[7] Incarcerees are also provided with standard issue hijabs.[8] This raises the question – why won't MSCO do the same?

78. Sheriff McFadden's acts or omissions, policies, and customs are not the least restrictive means of furthering a compelling government interest. Defendants could have, but did not, photograph Doe with her hijab for the purpose of the publicly accessible online

---

[5] *See* US Dept of State, Bureau of Consular Affairs https://travel.state.gov/content/travel/en/passports/how-apply/photos.html
[6] See State of New York, Dep't of Correctional Servs., Directive No. 4202, Religious Programs and Practices at 9. (October 19, 2015); *See also* https://www.nytimes.com/2020/11/09/nyregion/hijab-muslim-nypd-mugshotscarves.html; *See also* https://sd15.senate.ca.gov/news/ca-governor-signs-law-expanding-religious-rights-incarcerated (State of California passed legislation protecting religious head coverings in prisons in October of 2023).
[7] *Id.*
[8] *Id.*

database. Defendants could have, but did not, allow Doe to wear her hijab throughout mixed-gendered spaces in the facility. Defendants could have, but did not, inspect under Doe's hijab and shirt in a private room with only females present, as she requested.

79.     A hijab-less photo did not need to be Doe's standard identification photograph while incarcerated, so casually seen by all of those whom she interacted with. She could just as easily be identified with her hijab on, so long as her face is clearly visible like in a passport or driver's license photo.

80.     And certainly, now that she has been released and her charges dismissed, there is no reason for the government to retain copies of this illegally taken photo. If necessary for records, Doe is willing to retake her photograph with her hijab on to replace all existing hijab-less photos in every database.

81.     With deliberate indifference and conscious and reckless disregard of the security and religious rights of Doe, the official capacity Defendant maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied include, among others, the following policies, practices, and customs:

   a.     failing to adequately train, supervise, and control officers inappropriately permitting detainees to maintain religious practices, including the hijab;

   b.     failing to establish policies and procedures to enable detainees to maintain religious practices, including the hijab;

   c.     failing to adequately train, supervise, and control officers in the proper manner to remove religious head coverings worn by detainees;

   d.     failing to establish policies and procedures to protect detainees from being stripped of their religious rights; and,

16

e.     failing to adequately train, supervise, and control officers from properly preventing male officers and individuals from viewing female Muslim detainees who are not wearing the hijab or who are exposed while being strip-searched in violation of sincerely held religious beliefs.

82.     The policies, customs, and practices described above are evidenced by the treatment of Doe by MCDCC officers, namely that the official capacity Defendant's agents (a) forcibly removed Doe's obligatory religious headscarf without her consent and despite her notifying them of its religious significance; and (b) lifted Doe's shirt, exposing Doe to male and female passersby. These actions are evidence of the official capacity in which Sheriff McFadden systemically disregarded his constitutional obligations.

83.     In his official capacity, Sheriff McFadden had actual or constructive knowledge of the deficient policies, practices, and customs alleged above. He acted with deliberate indifference to the foreseeable effects and consequences of these policies, practices, customs, or omissions concerning the constitutional rights of Doe and other similarly situated detainees.

84.     As a direct and proximate result of Defendant's wrongful acts and omissions in their official capacity, Plaintiff has sustained damages and has suffered and continues to suffer mental anguish, physical and emotional distress, humiliation, and embarrassment.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to grant injunctive and declaratory relief in the form requested in the Prayer for Relief below; and further grant nominal, compensatory, and punitive damages together with costs and attorneys' fees wrongfully incurred to bring this action and all such other relief this Honorable Court deems just and equitable.

17

**Public Strip Search**
**Violation of Fourth Amendment to the United States Constitution**
**42 U.S.C. §1983**
**(Against Defendant Officer A)**

85.     Plaintiff repeats and re-alleges the above paragraphs as though fully set forth herein.

86.     At all relevant times, Doe was in the custody and control of Defendants while detained.

87.     At all relevant times, Officer A was a "state actor" under 42 U.S.C. § 1983 and acting under the color of state law.

88.     At all relevant times, Doe was under the direct supervision and control of Officer A.

89.     The Fourth Amendment to the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Courts have repeatedly emphasized the sanctity of every individual's right "to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." U.S. Const. amend. IV.

90.     The Fourth Amendment applies to the State of North Carolina through the 14th Amendment. U.S. Const. amend. XIV, § 1.

91.     42 U.S.C. § 1983 provides a vehicle for a private cause of action against state actors who engage in activities that violate an individual's rights guaranteed by the United States Constitution or an amendment to the Constitution.

18

92.     Based on her sincere religious beliefs, Doe considers being seen without this religious garment akin to being seen naked. Officer A removed Doe's hijab and searched her hair in plain view of male officer's and detainees. She also lifted up her shirt and exposed her stomach, an area Doe also keeps covered in line with her religious beliefs. Officer A then patted around Doe's breasts. Officer A effectively conducted a public strip search of Jane Doe.

93.     Under *Bell v. Wolfish*, 441 U.S. 520, 559 (1979), "such searches can be conducted on less than probable cause" only after balancing the "significant and legitimate security interests of the institution against the inmates' privacy interests."

94.     Officer A's public strip search of Doe was unreasonable. The defendant did not have any significant and legitimate security interests that outweighed Doe's privacy rights. She very easily could have provided Doe with a private room for the search, including the women's bathroom Doe suggested. She also could have simply escorted Doe to an empty, out of view space, or one with only females present to satisfy any perceived security interests. Instead, she removed Doe's hijab, exposed her stomach, and patted down her breasts in plain view of all those present.

95.     As a direct and proximate result of Officer A acts, practices, and decisions, Doe was deprived of her rights under the Fourth Amendment to be secure in her person against unreasonable searches and seizures. Officer A personally humiliated Plaintiff. She also did this despite being repeatedly informed of Doe's religious need for privacy. Officer A inflicted a degrading indignity that will affect Doe for the rest of her life and caused great injury, as alleged above.

96.     In her individual capacity, Officer A (a) forcibly removed Doe's obligatory religious headscarf without her consent and despite her notifying them of its religious

significance and (b) lifted Doe's shirt, exposing her to male and female passersby, even though there were private rooms available. These actions are evidence of the Defendants' disregard for their constitutional obligations toward Doe. She acted with deliberate indifference to the foreseeable effects and consequences of their actions in line with the policies, customs, or practices of the official capacity Defendant.

97.     This entitles Doe to recover compensatory and punitive damages against Officer A.

98.     Officer A acted under the color of state law and is not entitled to qualified immunity because she violated Doe's clearly established Fourth Amendment rights.

99.     Officer A violated clearly established law by performing an excessive and unreasonable search of Doe's person, refusing to provide any kind of privacy, and exposing Doe's hair and body in an open room in full view of male strangers.

100.     As a result, Doe has sustained damages, and has suffered and continues to suffer mental anguish, physical and emotional distress, humiliation, and embarrassment.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to grant compensatory, punitive, and nominal damages together with costs and attorneys' fees wrongfully incurred to bring this action and all such other relief this Honorable Court deems just and equitable.

**COUNT III**

**Free Exercise of Religion**
**Violation of First Amendment to the United States Constitution**
**42 U.S.C. §1983**
**(Against Individual Capacity Defendants)**

101.     Plaintiff realleges and incorporates by reference the above paragraphs of this Complaint as if fully set forth herein.

102.    Under the First Amendment, Plaintiff has the right to freely exercise her religion.

103.    42 U.S.C. § 1983 prohibits any person acting under color of state law, custom, or usage to deprive a citizen of rights secured by the United States Constitution.

104.    Defendants Officer A and Officer B, at all relevant times herein, were acting under the color of state law.

105.    Both defendants deprived Doe of her right to freely exercise her religion by denying her of her hijab and modest clothing while she was in their custody.

106.    Together, the individual capacity defendants stripped Doe of her hijab and photographed her, even though photographing her without a hijab did not further the defendants' interests in creating records by which Plaintiff could later be identified. Doe wears her hijab every day, so she would be more recognizable to the public and to Defendants with her hijab.

107.    Neither defendant is protected by qualified immunity because they violated clearly established law by publicly removing Doe's religious head covering, photographing her without it, and posting that photo for the public. Defendants were, at all relevant times, aware of Doe's religious beliefs and her need to maintain her modest attire and hijab. At all relevant times, Doe was statutorily protected by RLUIPA.

108.    As a direct and proximate result of Defendants' violation of 42 U.S.C. § 1983, Plaintiff has sustained damages and has suffered and continues to suffer mental anguish, physical and emotional distress, humiliation, and embarrassment.

109.    Officer A's denial and forcible removal of Doe's hijab imposed a substantial burden on her religious exercise by forcing her to violate her deeply held religious belief. This

21

action caused significant emotional distress and humiliation, as the act of removing her hijab in front of male officers was a direct violation of her religious principles.

110.    Officer B's decision to photograph Doe without her hijab imposed a substantial burden on her religious exercise by creating an accessible image of her in violation of her deeply held religious belief. This continues to cause significant emotional distress and humiliation, as having her photograph viewable by others is a direct violation of her religious principles.

111.    These actions are not the least restrictive means to justify a compelling government interest. The removal of the hijab was not necessary for the booking photograph, as Plaintiff's facial features could have been fully visible without requiring the removal of the hijab. They simply could have allowed her to retain her hijab or provided a uniform hijab / standard issue replacement.

112.    The forced removal of the hijab was not a mere inconvenience or minor interference; it was a profound violation of Doe's sincerely held religious beliefs against appearing in public uncovered.

113.    Doe is entitled to compensatory, constitutional, and nominal damages.

114.    Doe has sustained compensatory damages in the form of emotional distress and loss of dignity because of the unconstitutional conduct against her.

WHEREFORE, Plaintiff respectfully requests this Honorable Court to grant compensatory, punitive, and nominal damages together with costs and attorneys' fees wrongfully incurred to bring this action and all such other relief this Honorable Court deems just and equitable.

**COUNT IV**

**Due Process Clause**
**Violation of Fourteenth Amendment to the United States Constitution**
**42 U.S.C. §1983**
**(Against Official Capacity Defendant)**

115.  Plaintiff realleges and incorporates by reference the above paragraphs of this Complaint as if fully set forth herein.

116.  42 U.S.C. § 1983 prohibits any person acting under color of state law, custom, or usage to deprive a citizen of rights secured by the United States Constitution.

117.  The Due Process Clause of the Fourteenth Amendment prohibits the government (including Defendants) from depriving individuals of "life, liberty, or property" without due process of law.

118.  Liberty interests include the right to privacy under substantial due process, and may be implicated where a person's good name, honor, or integrity is at stake because of the government's actions. Here, Doe's name was tarnished not only by the publication of her hijab-less image, but also by the publication of her personal information alongside a crime that was ultimately dismissed.

119.  Private identifying information about Doe, including her photograph, birthdate, and city of residence, were published alongside her charges on MCSO's website without due process of law – a conviction. Moreover, her charges have long since been dismissed, but the MCSO website still associates her personal, private information with these charges to this day.

120.  The U.S. Supreme Court has long recognized all persons are presumed innocent until proven guilty, and are entitled to due process under the law:

> "The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the

23

foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453, 15 S.Ct. 394, 403, 39 L.Ed. 481 (1895). Our society's belief, reinforced over the centuries, that all are innocent until the state has proved them to be guilty, like the companion principle that guilt must be proved beyond a reasonable doubt, is "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), and is established beyond legislative contravention in the Due Process Clause. (citations omitted).

The Due Process Clause of the Fifth Amendment provides that "No person shall . . . be deprived of life, liberty, or property, without due process of law. . . ." This Court has held that the Due Process Clause protects individuals against two types of government action. So-called "substantive due process" prevents the government from engaging in conduct that "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), or interferes with rights "implicit in the concept of ordered liberty," *Palko v. Connecticut,* 302 U.S. 319, 325-326, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). This requirement has traditionally been referred to as "procedural" due process.

*U.S. v. Solerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 2102 (1987).

121.    Generally, procedural due process protects individuals from being criminally punished without notice and an opportunity to be heard. *Loudermill v. Cleveland Bd. of Ed*, 721 F.2d 550, 563 (1983) aff'd 470 U.S. 532 (1985) (Stating there is a "fundamental requirement that an individual be given the opportunity to be heard in a meaningful way.")

122. "[T]he touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis*, 523 U.S. 833, 845- 46 (1998).

123. Here, the actions of the government were arbitrary and without reasonable justification in the service of a legitimate governmental objective. In a similar situation where a sheriff's office posted the mugshots of detainees who had not been convicted, alongside their personal information, the Ninth Circuit recently interpreted the practice a punitive without justification under due process. *Houston v. Maricopa, Cnty. of, Arizona*, 2024 WL 4048897 (C.A.9 (Ariz.), 2024) (Finding no related legitimate government interest in maintaining security or pretrial detention).

124. Here, the government failed to afford Doe with any opportunity to be heard before digitally publishing her mugshot and other personal and confidential information on the internet and violated her privacy right. As a direct result, the government cause substantial reputational harm and humiliation against Doe. *See Id.* (Recognizing the significant reputational harm that mugshots can cause to an individual).

125. Abuse of mugshots posted to government websites by profiteers such as mugshot website operators has become widespread in recent years. Websites like 'Mugshot Zone' have wide sweeping effects not only on those directly impacted but on communities as a whole. *See* Gary Fields & John R. Emshwiller, *America Busted: As Arrest Records Mount, Consequences Last a Lifetime*, WALL ST. J., Aug. 19, 2014, at A1. These predatory websites only exist because of the reckless actions of law enforcement decision makers like Sheriff McFadden in digitally publishing the personal and confidential information of detainees

25

like Doe on their official websites. Again, this digital publication does not advance any legitimate law enforcement purpose, rather only serves to humiliate people like Doe who haven't even been convicted yet.

126. As a result, Doe has suffered and continues to suffer from damages to her data privacy and personal reputation caused by the Sheriff's wrongful publication of the mugshot and other personal and confidential information on the internet.

127. As a direct result of the wrongful acts of the Mecklenburg County Sheriff's Office, Doe's constitutional rights have been violated and they have and continue to suffer personal injuries, including emotional distress and pain and suffering, and damage to her personal reputation.

128. Sheriff McFadden's publication on the internet of Plaintiffs' mugshots and personal and confidential information was unwarranted under the circumstances and was objectively unreasonable when comparing or balancing the interests of the State. Therefore, by using subjectively and objectively unreasonable methods while acting under color of state law, Sheriff McFadden and the County violated Doe's rights under the United States Constitution.

129. In addition, upon information and belief, Sheriff McFadden is also liable under 42 U.S.C. § 1983 for failing to supervise and train the staff and officers MSCO who assisted in the improper publication of Plaintiffs' personal and confidential information on the MCSO Website.

130. The violations described above include supervising the staff and employees who manage and operate the mugshot portion of the MCSO Website, including but not limited to the publishing of mugshots and personal and confidential information (including Doe's

26

birthday and city of residence) with no due process, the use of the term "Arrest Type," the lack of placing any disclaimer on the Arrest Search webpage (i.e., stating that arrestees are innocent until proven guilty, or words to that effect) and failure to reflect the dismissal of charges.

**Prayer for Relief**

WHEREFORE, Plaintiff requests that this Honorable Court enter judgment in favor of Plaintiff and against Defendants, on each court in this Complaint, and enter an Order awarding the following relief:

a.  A declaratory judgement stating that the government's actions have violated Doe's rights under the Religious Land Use and Institutionalized Person's Act and Due Process Clause of the Fourteenth Amendment.

b.  A declaratory judgement stating that the individual capacity defendants' actions have violated Doe's rights under the Free Exercise Clause of the First Amendment.

c.  An injunction against the government ordering Mecklenburg County Sheriff's Office and Mecklenburg County Detention Center Central to destroy Doe's booking photographs without her hijab, as well as any and all security footage of Plaintiff without her hijab in the facility;

d.  An injunction against the government ordering Mecklenburg County Sheriff's Office to implement a policy change prohibiting officers and staff from taking photographs of Muslim women without their hijab;

e.  An injunction ordering the government to take every step, including, but not limited to, instructing other aforementioned persons or agencies given access to Doe's booking

photograph to destroy all copies of her booking photograph and any associated security footage;

f. An injunction against government ordering Mecklenburg County Sheriff's Office to implement a policy change prohibiting officers and staff from publicizing mugshots along with personal information on their website without due process of law.

g. Judgment in Plaintiff's favor on all causes of action alleged herein;

h. An award of compensatory, constitutional, and nominal damages as appropriate under 42 U.S.C. § 1983 and RLUIPA;

i. An award of attorneys' fees, costs, and expenses predicated upon 42 U.S.C. §§ 1988 and 2000cc-2(d), which authorize the award of attorneys' fees and costs to prevailing parties, pursuant to 42 U.S.C. § 1983 and RLUIPA; and,

j. Any further relief to which Plaintiff is entitled or that this Honorable Court deems just and proper.

**Jury Demand**

NOW COMES Plaintiff, through her counsel, and demands a trial by jury of the above-referenced causes of action.

Respectfully submitted,

/s/Ismaail Qaiyim
Ismaail Qaiyim, Esq. (56744)
Queen City Community Law Firm
4938 Central Ave.
Charlotte, NC 28205
(980)281-2798
www.qcclawfirm.com

*Co-Counsel for Plaintiff*

28

/s/Lena F. Masri
Lena F. Masri (VA 93291) *
lfmasri@cair.com
Gadeir Abbas (81161) *
gabbas@cair.com
Nadia Bayado (DC 90023648) *
nbayado@cair.com
**CAIR NATIONAL LEGAL DEFENSE FUND**
453 New Jersey Ave SE
Washington, DC 20003
(202) 742-6420

*Co-Counsel for Plaintiff*

*Special Admissions

**Dated:** September 27, 2024

## **VERIFICATION**

I, ████████ ead the forgoing complaint, and hereby swear and affirm that the

information above is true and accurate to the best of my knowledge and recollection.

Signed by:

████████████                                    8/16/2024

Name: ████████                                  Date

# EXHIBIT A



Return to Arrest Search

**Arrest #:** ▆▆▆▆▆▆

**PID:** ▆▆▆▆

**DOB:** ▆▆▆▆▆

**Race:** W

**Sex:** F

**Weight:** ▆▆▆

**Height:** ▆▆▆

**Address:** ▆▆▆▆▆▆▆▆▆▆

**Alias:**

**Arrested By:** MECKLENBURG COUNTY SHERIFFS OFFICE

**Arrest Date/Arrest Time:** 02/28/2024 15:28

**PID:** ▆▆▆▆

**Race:** W  **Sex:** F

**Height:** ▆▆▆  **Weight:** ▆▆▆

**Arrest Dt:** 02/28/2024  **Time:** 15:28

**Inmate Info (if available):** Inmate Inquiry

## CHARGES

| Arrest ID | Court Case | Arrest Type | Bond | Action Taken By: | Bond Type | Arrest Process: | Description: |
|---|---|---|---|---|---|---|---|
| ▆▆▆ | ▆▆▆ | MISDEMEANOR | 0 | | WPA | ORDER | CITY/TOWN VIOLATION (M) |
| ▆▆▆ | ▆▆▆ | TRAFFIC | | | WPA | ORDER | SEE PAPERWORK FOR CHARGE |

CITY/TOWN VIOLATION (M)

**Arrest Type:** MISDEMEANOR

**Case:** ▮▮▮▮▮▮▮▮

**Bond Type:** WPA

**Bond Amount:** 0

**Action Taken By:**

**Process:** ORDER

SEE PAPERWORK FOR CHARGE

**Arrest Type:** TRAFFIC

**Case:** ▮▮▮▮▮▮▮▮

# EXHIBIT B

## Re: Mecklenburg County Mugshots Zone Request removal - CAIR Legal Defense Fund

**MugshotsZone RemoveListing** <removelisting@mugshots.zone>

Wed 8/28/2024 1:45 PM

To:Aya Beydoun <abeydoun@cair.com>



### Hi, CAIR Legal Defense Fund

https://mecklenburgnc.mugshots.zone ████████-mugshot-02-28-2024/

We have removed your information from mugshots.zone, bustednewpaper.com and associated BustedNewpaper Facebook page (if any).

It generally takes several days for all search engines to remove their search results and images.

Ticket ID: ZUBH5V
Assigned agent: Craig

**PREVIOUS MESSAGES:**

### Agent wrote:

Thank you for your email. We'll reply as soon as we can. Your case number is ZUBH5V.

Wed, 8/28/2024, 3:39 PM UTC

**abeydoun@cair.com** wrote:

Mecklenburg County Mugshots Zone Request removal - CAIR Legal
Defense FundFrom: CAIR Legal Defense Fund
Email: abeydoun@cair.com
Phone: 202-742-6449
URL to remove: https://mecklenburgnc.mugshots.zone███████████-
mugshot-02-28-2024/

Reason: Dismissed

I am submitting this request on behalf of our client, ████████. Please
see the attached letter from our office.

--
This e-mail was sent from a contact form on Mecklenburg County
Mugshots Zone (https://mecklenburgnc.mugshots.zone)

ATTACHMENTS

CAIR-Demand-Letter-to-MugShot-Zone-RE-███████-8.28.24.pdf

Wed, 8/28/2024, 3:39 PM UTC

This email is delivered by **HelpDesk**